# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | Case No. 3:18-cr-489-RAH-SMD |
| | ) | |
| **ROYZELL LIGON, JR.** | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

On April 3, 2018, Opelika Police Officer Fred Griffin initiated a police-citizen encounter with Defendant Royzell Ligon, Jr. (Doc. 115, pp. 4–5). During the encounter, Officer Griffin discovered an active warrant for Defendant's arrest. *Id.* at 13. Officer Griffin arrested Defendant, searched his person, and found a firearm and illegal narcotics. *Id.* at 13–14; Doc. 108, p. 4. A grand jury later indicted Defendant on one count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1) and two counts of Possession of a Controlled Substance in violation of 21 U.S.C. § 844(a). (Doc. 45, pp. 1–2).

Following his indictment, Defendant moved to suppress the evidence found on his person, arguing that the evidence was obtained in violation of the Fourth Amendment. (Doc. 96). The Government filed an opposition to Defendant's Motion, maintaining that no Fourth Amendment violation occurred. (Doc. 108). On October 28, 2020, the undersigned held a hearing on Defendant's Motion. (Doc. 114). For the following reasons, the undersigned RECOMMENDS that the Motion (Doc. 96) be DENIED.

I.  **FINDINGS OF FACT**

On April 3, 2018, Police Officer Fred Griffin reported to the Opelika Police Department for his scheduled night patrol. (Doc. 115, pp. 4, 17).[1] During his shift briefing, Officer Griffin was instructed to be on the lookout for one Moses Edwards, an individual suspected of committing a murder in Opelika four days earlier. *Id.* at 5–6; Doc. 96, p. 1, ¶ 1. Officer Griffin was informed that Edwards was an African American male, weighing approximately 190 pounds and standing 6'4" tall. (Doc. 115, pp. 5, 16–17). Officer Griffin began his shift that evening at 6:00 p.m. *Id.* at 5–6.

Just before 8:30 p.m., Officer Griffin was driving roughly a mile from where the murder occurred when he observed a middle-age African American male—later identified as Defendant Royzell Ligon, Jr.—walking in the middle of the road ahead. *Id.* at 6, 16–18. Although it was dark, Officer Griffin could see that Defendant was wearing all black and carrying a bottle in his hand. *Id.* at 6. As Officer Griffin approached, Defendant moved to the side of the road. *Id.* at 21. Officer Griffin slowly drove by with his headlights on and observed that Defendant had a medium-brown skin complexion and was approximately 6'4" tall with an average build. *Id.* at 6, 17–18. Officer Griffin also observed that Defendant had a goatee, beard, and mustache. *Id.* at 6–7.

Based on his observations, Officer Griffin believed that Defendant matched the description of the murder suspect. *Id.* at 8, 22.[2] Officer Griffin parked and exited his patrol

---

[1] On the day in question, Officer Griffin had served as a patrolman for the Opelika Police Department for three years. (Doc. 115, p. 19).

[2] During the suppression hearing, Officer Griffin was unable to definitively recall whether he observed a photograph of Edwards before making contact with Defendant. (Doc. 115, pp. 5, 16–18).

2

vehicle to make contact with Defendant. *Id.* at 8. Officer Griffin told Defendant that he only wanted to talk, but Defendant said he did not want to speak with Officer Griffin. *Id.* Defendant then walked to a nearby house where a man was standing outside. *Id.* at 8, 23. Defendant asked the homeowner for permission to sit on his porch, and the homeowner agreed. *Id.* at 8, 24.

Officer Griffin did not tell Defendant to stop or otherwise dissuade Defendant from walking to or sitting on the homeowner's porch. (Doc. 108-2 at 00:38-01:25). Instead, Officer Griffin reiterated that he only wanted to speak with Defendant and asked Defendant for his name, which Defendant provided. (Doc. 115, p. 23). Officer Griffin also asked Defendant whether he lived at the residence. *Id.* Defendant responded that he did not and that he did not want to discuss anything. *Id.*

At that time, Opelika Police Officer Guy arrived at the scene in his patrol car. *Id.* at 9, 25. Officer Griffin left Defendant and walked back to the street to meet Officer Guy. *Id.* at 9. Officer Griffin explained to Officer Guy that he believed Defendant matched the description of the murder suspect. *Id.* To investigate further, Officers Griffin and Guy walked to Officer Griffin's vehicle. *Id.* at 10. There, they pulled up three known photographs of Edwards on Officer Griffin's computer. *Id.* at 10, 26–27.[3] They also accessed an e-mail that Officer Griffin had received earlier that day, which described Edwards as a thirty-four-year-old African American male weighing 196 pounds and standing 6'4" tall. *Id.* at 26–27; Gov't's Ex. 3.

---

[3] The three photographs showed a frontal view of Edwards's face and shoulder area. (Doc. 115, pp. 30–31).

3

Officers Griffin and Guy compared the description and photographs of the murder suspect with their observations of Defendant. (Doc. 115, p. 10). Neither officer, however, could determine for certain whether Defendant was Edwards. *Id.* at 10, 26. Nevertheless, Officer Griffin maintained his belief that Defendant matched the description of Edwards. *Id.* at 10. Officer Griffin commented that Defendant and Edwards had similar skin tones, facial features, and haircuts. *Id.* at 10, 22. He also noted that Defendant and the murder suspect were similar in height and build. *Id.* at 22.

To confirm Defendant's identity, Officers Griffin and Guy walked back to Defendant and on the porch. *Id.* at 11, 33–35. Officer Griffin asked Defendant for photo identification. *Id.* at 10–11, 33. Defendant, having none, instead provided his social security number. *Id.* at 11. Officer Griffin asked Defendant whether he had been drinking, and Defendant responded that he had consumed two shots of liquor. (Doc. 108-2 at 06:40–06:50). Defendant also admitted that there was liquor in his bottle and, without being prompted, poured the bottle's remaining contents onto the ground. *Id.* at 07:05–07:20. Officer Griffin told Defendant to "chill" with Officer Guy and he would "be right back," before returning to his patrol vehicle. *Id.* at 07:29–07:31.

Unbeknownst to Officer Griffin, however, he had incorrectly written down Defendant's social security number on his notepad. (Doc. 115, p. 12). Accordingly, when he entered the number into his computer, the number came back as belonging to a white male. *Id.* at 39. Officer Griffin, unaware that he had made the mistake, returned to the porch and asked Defendant to repeat his social security number, which Defendant again provided. *Id.* at 12, 36–39. As Officer Griffin walked backed to his vehicle, he met a female officer

4

arriving on the scene and told her that Defendant had just provided false information. (Doc. 108-2 at 10:10–10:32).

Back at his vehicle, Officer Griffin correctly entered Defendant's social security number in his police database and confirmed that Defendant was not Edwards. (Doc. 115, p. 13). In doing so, Officer Griffin also asked dispatch to confirm whether Defendant had any active warrants. *Id.* While waiting to hear back from dispatch, Officer Griffin returned to the porch and explained to Defendant that, because he had been drinking, he had to ride home with Officer Griffin or arrange for someone to pick him up. (Doc. 108-2 at 12:35–13:29). Defendant refused to ride home with Officer Griffin. *Id.* at 13:27–13:30; 14:42–14:58.

As Defendant sat on the porch arranging his own means of transportation, dispatch informed Officer Griffin that Defendant had an active arrest warrant for failure to appear on a charge of Possession of Marijuana. (Doc. 115, pp. 13, 41–42; Doc. 96, p. 2, ¶ 6). Officer Griffin immediately arrested Defendant and searched his person incident to arrest. (Doc. 115, pp. 13–14). During the search, Officer Griffin found the handgun, marijuana and crack cocaine giving rise to the instant federal charges. (Doc. 108, p. 4; Doc. 45, pp. 1–2).

## II.   LEGAL STANDARDS

The purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967)). The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV. This protection is enforceable against state actors through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).[4]

### A. Fourth Amendment Seizure

The Supreme Court has long recognized "that the Fourth Amendment's protection against unreasonable . . . seizures includes seizure of the person." *California v. Hodari D.*, 499 U.S. 621, 624 (1991) (alteration in original). Analyzing a Fourth Amendment seizure of a person is dual inquiry. *See United States v. Sharpe*, 470 U.S. 675, 682 (1985). The threshold question is whether the person was "seized" as that term is used in the Fourth Amendment. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

A person is seized within the meaning of the Fourth Amendment when: (1) a police officer uses physical force or a showing of authority to restrain the person's movement,[5] or (2) a reasonable person would not have believed he was free to leave under the same circumstances.[6] Examples of such circumstances include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, [and] the use of language or tone of voice indicating that compliance with

---

[4] In this case, the challenged government action was conducted by agents of the Opelika, Alabama Police Department. (Doc. 115, pp. 4–5, 25). Accordingly, for the balance of this Recommendation, any reference to the "Fourth Amendment" specifically refers to the Fourth and Fourteenth Amendments.

[5] *Hodari D.*, 499 U.S. at 624–27.

[6] *Mendenhall*, 446 U.S. at 554.

the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554. The inquiry is an objective one, meaning that the subjective intentions of law enforcement are irrelevant to the analysis. *See, e.g.*, *id.* at 554 n.6; *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015).

Importantly, however, not all police-citizen encounters amount to a Fourth Amendment "seizure." *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006). A police officer, for instance, does not effectuate a seizure "by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). Neither does an officer convert a police-citizen encounter into a seizure simply by identifying himself as a police officer. *Id.* If no seizure occurs, the Fourth Amendment is inapplicable. *Id.* at 498.

If a seizure occurs, the analysis shifts to whether the seizure constituted a *Terry*[7] stop or an arrest. *See Sharpe*, 470 U.S. at 682. A *Terry* stop is "a brief, warrantless, investigatory stop of an individual" that is less intrusive than an arrest. *United States v. Lester*, 477 F. App'x 697, 698 (11th Cir. 2012). There is no "'bright line' rule" for determining whether a given seizure is a *Terry* stop or an arrest. *Sharpe*, 470 U.S. at 685 (1985). Neither is there a bright line rule for determining when a *Terry* stop matures into an arrest. *Lester*, 477 F. App'x at 697–98.

---

[7] *Terry v. Ohio*, 392 U.S. 1, 19 (1968).

Instead, the Eleventh Circuit considers "four non-exclusive factors" when determining whether a given seizure was and remained a *Terry* stop rather an arrest. *See, e.g.*, *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004); *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000). Those factors are: (1) "the law enforcement purposes served by the detention," (2) "the diligence with which the police pursue the investigation," (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention." *Acosta*, 363 F.3d at 1146 (quoting *Gil*, 204 F.3d at 1351).

Under the first factor, the key consideration is whether police pursued "a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." *Id.* (quoting *Gil*, 204 F.3d at 1351). The second factor turns on "whether the police were diligent in pursuing their investigation, that is, whether the methods the police used were carried out without unnecessary delay." *Id.* With respect to the third factor, the question is "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Id.* Finally, the fourth factor asks "whether the duration of the detention was reasonable." *Id.*

### B.  Reasonableness of a Fourth Amendment Seizure

The Fourth Amendment does not proscribe all seizures of the person, "but only those that are unreasonable." *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006) (quoting *United States v. Bachner*, 706 F.2d 1121, 1125 (11th Cir. 1983)); *see also Elkins v. United States*, 364 U.S. 206, 222 (1960). The Fourth Amendment's reasonableness requirement applies to both *Terry* stops and arrests. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). That said, the standard for determining whether

8

a seizure is "reasonable" varies depending on whether the seizure is a *Terry* stop or an arrest. *See Brown v. Texas*, 443 U.S. 47, 50 (1979).

An arrest is reasonable only if it is supported by probable cause. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). Probable cause to arrest "exists if the facts and circumstances known to the officer [would] warrant a prudent man in believing that [an] offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959). Whether probable cause exists is an objective inquiry; an officer's subjective intentions "play no role" in the determination. *Pringle*, 517 U.S. at 813. An arrest lacking probable cause is unreasonable under the Fourth Amendment. *Henry*, 361 U.S. at 101.

By contrast, a *Terry* stop need only be supported by reasonable suspicion to be lawful under the Fourth Amendment. *Dunaway v. New York*, 442 U.S. 200, 208–09 (1979). Reasonable suspicion exists when a police officer has specific and articulable facts that, taken together with rational inferences from those facts, lead him to believe that criminal activity is afoot. *Terry*, 392 U.S. at 21, 30.[8] Whether reasonable suspicion exists is likewise an objective inquiry, which "must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

To be sure, the reasonable suspicion standard requires "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* at 124 (quoting *Terry*, 392 U.S. at 27). But it "is a less demanding standard than probable cause and requires a showing

---

[8] To be clear, the undersigned is specifically referring to the standard for conducting a *Terry* stop. Reasonable suspicion to conduct a "*Terry* frisk" exists when a reasonable person would believe that the person "with whom he is dealing may be armed and presently dangerous . . . ." *Terry*, 392 U.S. at 30.

9

considerably less than preponderance of the evidence . . . ." *Id.* at 123. Simply put, "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). A *Terry* stop unsupported by reasonable suspicion is unlawful under the Fourth Amendment. *Terry*, 392 U.S. at 21.

### C. The Fourth Amendment's Exclusionary Rule

The Fourth Amendment's exclusionary rule prohibits the use of illegally obtained evidence at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009). The exclusionary rule applies to both "primary evidence obtained as a direct result of an illegal search or seizure," and "evidence later discovered and found to be derivative of an illegality" (i.e., "fruit of the poisonous tree"). *Segura v. United States*, 468 U.S. 796, 804 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). The exclusionary rule, however, does not suppress all illegally obtained evidence. *Herring*, 555 U.S. at 140. The rule applies only "where its deterrence benefits outweigh its substantial social costs."[9]

Accordingly, there are several exceptions to the exclusionary rule.[10] One such exception is the attenuation doctrine. *Utah v. Strieff*, 136 S. Ct. 2056, 2064 (2016). Under the attenuation doctrine, illegally obtained evidence "is admissible when the connection

---

[9] *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (internal citation omitted) (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998)).

[10] *See, e.g.*, *Murray v. United States*, 487 U.S. 533, 537 (1988) (independent source doctrine); *Nix v. Williams*, 467 U.S. 431, 443–44 (1984) (inevitable discovery doctrine); *United States v. Leon*, 468 U.S. 897, 920–21 (1984) (good faith doctrine).

between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* at 2061 (quoting *Hudson*, 547 U.S. at 591).

## III. DISCUSSION

At the outset, it is important to clarify what is uncontested in this case. The Government concedes that a *Terry* stop of Defendant occurred. (Doc. 115, pp. 37–38).[11] Additionally, the Government does not contest that Defendant was arrested for Fourth Amendment purposes when Officer Griffin discovered the warrant for Defendant's arrest. Defendant, for his part, does not contest the constitutional validity of the arrest warrant. Accordingly, the undersigned proceeds to analyze Defendant's Motion in the following manner.

The undersigned first determines whether Defendant was "seized" within the meaning of the Fourth Amendment *before* Officer Griffin discovered the warrant for his arrest—and if so, whether the seizure was a *Terry* stop or an arrest. If Defendant was seized, the undersigned next analyzes whether the seizure was lawful under the Fourth Amendment. Finally, assuming the seizure was unlawful, the undersigned considers whether the evidence found on Defendant's person should be suppressed under the Fourth Amendment's exclusionary rule.

---

[11] In making this concession, the Government failed to specify with precision when the *Terry* stop of Defendant occurred. *See* Doc. 115, pp. 37–38.

11

**A.  Seizure Analysis**

To begin, the undersigned determines whether Defendant was "seized" for Fourth Amendment purposes. *See Mendenhall*, 446 U.S. at 554. If so, the undersigned analyzes whether the seizure constituted a *Terry* stop or an arrest. *See Sharpe*, 470 U.S. at 682.

### 1.  *Defendant was seized when Officer Griffin told him to "chill" with Officer Guy and he would "be right back."*

Under the Fourth Amendment, a person is seized when law enforcement uses physical force or a makes a showing of authority to restrain the person's movement; or when a reasonable person would not feel free to leave under the same circumstances. *Hodari D.*, 499 U.S. at 624–27; *Mendenhall*, 446 U.S. at 554. Here, the record indicates that law enforcement neither employed physical force nor made any showing of authority to restrain Defendant's movement before Officer Griffin discovered the warrant for Defendant's arrest.

At the outset of the encounter, Officer Griffin did not tell Defendant to "stop" or otherwise prevent Defendant from walking to the homeowner's porch. At no time during the encounter did an officer activate his or her emergency lights or brandish a service weapon. No officer used a harsh tone of voice when speaking with Defendant or threated Defendant in any way. The officers did not corner or isolate Defendant. In sum, the undersigned finds that law enforcement did not use physical force or make a showing of authority to restrain Defendant's movement before Officer Griffin discovered the warrant.

However, the undersigned finds that Defendant was seized for Fourth Amendment purposes when Officer Griffin told him to "chill" with Officer Guy and he would "be right

12

back." As previously explained, "the use of language or tone of voice indicating that compliance with the officer's request might be compelled" suggests that a Fourth Amendment "seizure" has occurred. *Mendenhall*, 446 U.S. at 554. Here, Officer Griffin told Defendant to "chill" with Officer Guy and he would "be right back." At that moment, a reasonable person would not have felt free to leave the scene under the same circumstances, meaning that Defendant was "seized" for Fourth Amendment purposes.

### 2. *The seizure of Defendant was a* **Terry** *Stop until Officer Griffin discovered the warrant for Defendant's arrest.*

The undersigned next considers whether the "seizure" of Defendant was and remained a *Terry* stop, rather than an arrest. *See Sharpe*, 470 U.S. at 682. This analysis requires a balancing of four factors: (1) "the law enforcement purposes served by the detention," (2) "the diligence with which the police pursue the investigation," (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention." *Acosta*, 363 F.3d at 1146 (quoting *Gil*, 204 F.3d at 1351). The Government bears the burden to demonstrate by a preponderance of the evidence that the seizure was and remained a *Terry* stop, rather than an arrest. *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985) (citing *Royer*, 460 U.S. at 500).

Under the first factor, the key consideration "is whether the police detained [Defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." *Acosta*, 363 F.3d at 1146. Here, Officer Griffin stopped Defendant to verify whether he was Edwards, a suspected murderer. He pursued his investigation by approaching and asking Defendant to speak with

13

him, which Defendant initially declined. Officers Griffin and Guy compared a description and three known photographs of Edwards with their observations of Defendant, but were still uncertain as to whether Defendant was the murder suspect. Accordingly, Officer Griffin requested and received Defendant's social security number, which allowed him to confirm that Defendant was not Edwards.

After verifying Defendant's identity, Officer Griffin explained to Defendant that, because he had been drinking, he needed to either ride home with Officer Griffin or have someone pick him up. Defendant, however, refused a ride from Officer Griffin and was unable to secure another form of transportation before dispatch informed Officer Griffin that Defendant had an active warrant for his arrest. Accordingly, the undersigned finds that law enforcement pursued its investigation of Defendant in a manner that was designed to lead to an efficient outcome. Thus, the first factor suggests that the seizure of Defendant was a *Terry* stop until Officer Griffin discovered the warrant for Defendant's arrest.

Under the second factor, the inquiry is "whether the police were diligent in pursuing their investigation, that is, whether the methods the police used were carried out without unnecessary delay." *Acosta*, 363 F.3d at 1146. Here, nothing in the record leads to the conclusion that law enforcement was not diligent in confirming Defendant's identity. To be sure, Officer Griffin would have verified Defendant's identification sooner had he not initially miswritten Defendant's social security number. But there is no evidence to suggest that Officer Griffin tactically made that mistake to prolong Defendant's detention.

Moreover, after confirming Defendant's identity, Officer Griffin offered to give him a ride home, but Defendant refused. Officer Griffin immediately arrested Defendant upon

14

learning that there was an active warrant for Defendant's arrest. Accordingly, the undersigned finds that law enforcement was diligent in pursuing its investigation of Defendant. Thus, the second factor leads to the conclusion that the seizure of Defendant was a *Terry* stop until Officer Griffin discovered the warrant for Defendant's arrest.

Under the third factor, the inquiry is "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Acosta*, 363 F.3d at 1146. As previously explained, neither Officer Griffin nor Officer Guy used physical force or made a showing of authority to restrain Defendant's movement before discovering the warrant for Defendant's arrest. Officer Griffin simply told Defendant to "chill" with Officer Guy and he would "be right back." The officers did not even ask Defendant to move from the homeowner's porch. Accordingly, the undersigned finds that the scope and intrusiveness of the seizure was reasonable. Thus, the third factor suggests that the seizure of Defendant was a *Terry* stop until Officer Griffin discovered the warrant for Defendant's arrest.

The fourth and final factor turns on whether the duration of the investigation was reasonable. *Acosta*, 363 F.3d at 1147. The Supreme Court has repeatedly emphasized that there is no "hard-and-fast time limits" for when a *Terry* stop matures into an arrest. *United States v. Montoya de Hernandez*, 473 U.S. 531, 543 (1985); *accord United States v. Place*, 462 U.S. 696, 709 n.10. Instead, the inquiry is "whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Acosta*, 363 F.3d at 1146.

As previously explained, Officers Griffin and Guy diligently investigated whether Defendant was the murder suspect. Moreover, less than eight minutes passed from the time Defendant was seized to when Officer Griffin verified Defendant's identity. Officer Griffin used that time to determine whether Defendant was the murder suspect. Any additional delay resulted from Defendant's refusal to ride home with Officer Griffin. Accordingly, the undersigned finds that the duration of Defendant's seizure was reasonable. Thus, the fourth factor suggests that the seizure of Defendant was a *Terry* stop until Officer Griffin discovered the warrant for Defendant's arrest. For these reasons, the undersigned concludes that the seizure of Defendant was a *Terry* stop until Officer Griffin discovered the warrant for Defendant's arrest.

### B.     Reasonableness Analysis

Next, the undersigned considers whether the *Terry* stop of Defendant, in its entirety, was lawful under the Fourth Amendment. Reasonable suspicion exists when a police officer has specific and articulable facts that, taken together with rational inferences from those facts, lead him to believe that a crime has occurred or is occurring. *See Terry*, 392 U.S. at 21, 30. The Government bears the burden to demonstrate by a preponderance of the evidence that a *Terry* stop was supported by reasonable suspicion. *See, e.g.*, *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020); *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013).

Before the *Terry* stop of Defendant occurred, Officer Griffin had reviewed a description and three known photographs of the murder suspect. Officer Griffin had spoken with Defendant and observed Defendant's height, weight, skin complexion, facial features,

16

and haircut. Officer Griffin's knowledge and observations led him to believe that Defendant was Edwards. Moreover, Officer Griffin was aware that the murder had occurred just four days earlier and less than a mile from where he encountered Defendant.

To be sure, Officer Griffin was not certain that Defendant was Edwards. Reasonable suspicion, however, does not require certainty. *Wardlow*, 528 U.S. at 123. It cannot be said that Officer Griffin had only "an 'inchoate and unparticularized suspicion or hunch'" that Defendant matched the description and photographs of Edwards. *Id.* at 124. Instead, the record indicates that, before the *Terry* stop occurred, Officer Griffin had specific and articulable facts leading him to believe that Defendant was the murder suspect. Thus, Officer Griffin had reasonable suspicion to believe that Defendant was the murder suspect from the outset of the *Terry* stop until he confirmed Defendant's identity.

Furthermore, the record indicates that Officer Griffin developed independent reasonable suspicion to believe that Defendant had committed the crime of public intoxication. Under Alabama law, "[a] person commits the crime of public intoxication if he appears in a public place under the influence of alcohol . . . to the degree that he endangers himself or another person or property . . . ." ALA CODE § 13A-11-10 (1975). Officer Griffin witnessed Defendant walking in the middle of the road, after dark, wearing all black and carrying a bottle that Defendant later admitted contained alcohol. Defendant also admitted that he had consumed liquor. Accordingly, before the *Terry* stop occurred, Officer Griffin developed independent reasonable suspicion to believe that Defendant had committed the offense of public intoxication. The undersigned therefore finds that the *Terry* stop, in its entirety, was lawful.

### C. Exclusion Analysis

Even assuming the *seizure* of Defendant was unlawful, the evidence found on Defendant's person is admissible under the Fourth Amendment. Under the attenuation exception to the Fourth Amendment's exclusionary rule, illegally obtained evidence "is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Strieff*, 136 S. Ct. at 2061 (quoting *Hudson*, 547 U.S. at 591). The Government bears the burden to show by a preponderance of the evidence that the attenuation doctrine applies in any given case. *See United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982) (citing *Brown*, 422 U.S. at 600–04).

In *Utah v. Strieff*, the Supreme Court considered how the attenuation doctrine applies where an unconstitutional *Terry* stop leads to the discovery of a valid arrest warrant. *Id.* at 2060. In *Strieff*, a detective conducted a *Terry* stop of Edward Strieff to investigate suspected narcotics activity. *Id.* at 2059–60. During the stop, the detective asked Strieff for identification, and Strieff complied. *Id.* at 2060. The detective relayed Strieff's information to a police dispatcher who, in turn, informed the detective that Strieff had an active warrant for a traffic violation. *Id.* The detective arrested Strieff, searched his person incident to arrest, and found methamphetamine and drug paraphernalia. *Id.*

Before trial, Strieff moved to suppress the evidence found on his person, arguing that the initial *Terry* stop lacked reasonable suspicion. *Id.* At the suppression hearing, the prosecution conceded that the *Terry* stop lacked reasonable suspicion, "but argued that the

18

evidence should not be suppressed because the existence of a valid arrest warrant attenuated the connection between the unlawful stop and the discovery of the contraband." *Id.* The trial court declined to suppress the evidence, and the Utah Court of Appeals affirmed. *Id.* The Utah Supreme Court, however, reversed and suppressed the evidence. *Id.*

The United States Supreme Court granted *certiorari* to determine "how the attenuation doctrine applies where an unconstitutional detention leads to the discovery of a valid arrest warrant." *Id.* at 2060. The Court held that, absent flagrant police misconduct, the discovery of a valid, preexisting arrest warrant attenuates the connection between an unlawful *Terry* stop and evidence subsequently seized incident to arrest. *Id.* at 2064. The Court reasoned that the discovery of an arrest warrant is an intervening circumstance that breaks the causal chain between an unlawful *Terry* stop and an otherwise lawful search incident to arrest. *Id.* 2062–63. The Court therefore concluded that the evidence found on Strieff's person was admissible under the attenuation exception to the exclusionary rule. *Id.* at 2064.

The facts here are essentially identical to those in *Strieff*. The record reflects that Officer Griffin stopped Defendant as part of an ongoing murder investigation. During the stop, Officer Griffin learned that Defendant had a valid, preexisting warrant for his arrest. He arrested Defendant, searched his person incident to arrest, and found a firearm and controlled substances. As previously explained, nothing in the record suggests police misconduct in this case. Thus, even assuming that the seizure of Defendant was unlawful, the undersigned concludes that the evidence found on Defendant's person is admissible under the attenuation exception to the Fourth Amendment's exclusionary rule.

19

## IV. CONCLUSION

For these reasons, the undersigned magistrate judge RECOMMENDS that Defendant's Motion to Suppress (Doc. 96) be DENIED.

It is further ORDERED that the parties shall file any objections to this Recommendation on or before December 18, 2020. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which each objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation, and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1; *see also Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 4th day of December, 2020.

Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE